[L. A. No. 16474. In Bank.—March 24, 1938.]

JACK SCHALLER, etc., Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION, etc., and JOHN BARR, a Minor, etc., Respondents.

Jerome H. Kann for Petitioner.

Everett A. Corten for Respondents.

SEAWELL, J.—This proceeding in *certiorari* was instituted by petitioner Jack Schaller to secure the annulment of an award made against him by the Industrial Accident Com-

mission for the death of Sue Alric Marrion, an aerialist who was fatally injured on May 7, 1936, during the performance of her act in a Canadian showhouse, when one of the ropes gave way at a height of eighty feet. The question is whether decedent was an independent contractor at the time of the accident, or whether she was an employee of petitioner.

For a number of years, so the record shows, petitioner, operating under the name of Jack Schaller Attractions, has conducted the business of theatrical or free attraction contractor. He maintains a place in Los Angeles furnished with acrobatic and aerial equipment which performers are permitted to use without charge in order to build up or rehearse an act, or maintain physical fitness. Petitioner does not supervise or direct the creation of an act, but he secures bookings, or contracts for the performance of certain acts which are ready for the stage.

On December 29, 1935, petitioner entered into a written contract with the manager of the Conklin and Garrett All Canadian Shows. This contract provided that in consideration of $225 a week to be paid to petitioner or his representative, petitioner would furnish to the Conklin Shows in Canada, for a period of nine weeks, with option for the remainder of the season, an act known as the 4 Queens of the Air, which act would be performed twice daily at a time designated by petitioner; that the troupe would put up and take down its own rigging; that after the act joined the show, transportation would be furnished; that the manager of the act would be either Eddie Kunze or Milo L. Jones; that the manager would act as a substitute performer in the absence of any member of the troupe; that petitioner would hold the show ''harmless on account of any accident or injury occurring to . . . (petitioner) or any of his employees, during any and/or all of said performances while engaged under the employment as provided in this contract''; and that where conditions were not suitable for a standard performance without serious injury or loss of life to petitioner's ''performers and employees'', there should be no reduction in the salary or monies due from the show.

At the time this agreement was executed, petitioner believed that he would be able to secure the services of either the troupe of aerialists managed by Kunze, or that managed by Jones. Later he found that neither the Kunze nor the Jones

troupe would go to Canada. Meanwhile an aerial specialty act had been originated and organized by four women aerialists who had contacted each other while rehearsing at petitioner's place. Sue Alric Marrion was one of these four women. The aerialists called their act the "Four Aerial Queens", and they selected the husband of one of them to act as rigging man and substitute performer for the troupe. Petitioner told the troupe of the Canadian opening and they signified their willingness to fill the engagement. The Conklin Shows agreed orally to accept them as a substitute for the Kunze or Jones troupe under terms substantially as set forth in the written contract with petitioner. Petitioner thereupon made a separate oral agreement with each of the five members of the troupe; he did not contract with the troupe as a unit. His agreement with Sue Alric Marrion, similar to his agreement with the other troupers, was that she would perform her specialty act for twenty weeks for the sum of $600, performing to the best of her ability. Petitioner furnished a truck containing two bunks and equipment, and oil and gas sufficient to transport the troupe to the point where they joined the show. By mutual agreement it was arranged that payment of compensation would be handled in the following manner: The Conklin Shows had contracted to pay petitioner $225 a week for the act. The rigging man was selected to receive and disburse this sum as follows: $42.50 to petitioner for rent of equipment; $22.50 to petitioner as a 10 per cent commission; $30 to each of the four women aerialists; $40 retained by the rigging man.

Petitioner testified that he did not consider the members of the troupe as his employees and that he carried no compensation insurance; that the performers were independent contractors; and that he acted only as their booking agent. He stated that he did not direct or supervise the formation of their act in any manner; that he exercised no control whatsoever over any detail of its performance; that Sue Alric Marrion, and each other trouper, performed her specialty as she saw fit, directed the installation of equipment for her use, and directed the manner in which the other performers were to assist her; that no member of the troupe controlled or directed any other member; that each performer made her own decision as to the duration of her act, the number of loops to be made, the kind, the height, and the tricks to be

exhibited. Petitioner testified that the rigging man was not managing the act as his agent; that he was merely chosen by the troupe to perform certain duties for them, including the disbursement of compensation.

Petitioner stated that intoxication would be ground for breaking his contract with a performer, but otherwise he was without power to discharge where a performance was satisfactory according to the performer's own judgment. Petitioner gave as his reason for making a separate oral agreement with each performer, rather than a contract with the troupe as a unit, his desire to retain control over any change of personnel in the troupe; if one performer left, he could substitute another performer of his own choice. He stated that the troupe was bound to perform at the Conklin showhouses during the designated period, giving a specified number of daily performances at the times indicated by the show, and he could not have changed the troupe to other shows except by mutual agreement. Petitioner further testified that he was obligated to pay the aerialists according to his guarantee of $600 ($30 a week for 20 weeks), and that regardless of what might happen to the Conklin shows, bankruptcy, for example, he would still have to pay.

The testimony given by other witnesses at the hearing, including members of the troupe, was of like import to that of petitioner. From this evidence the commission concluded that Sue Alric Marrion was petitioner's employee, and that her death resulted from injury sustained in the course of that employment.

 Where findings made by the commission are supported by substantial evidence, or by inferences which may fairly be drawn from the evidence, even though the evidence be susceptible of opposing inferences, those findings will not be disturbed by an appellate tribunal. (*Schramm* v. *Industrial Acc. Com.*, 15 Cal. App. (2d) 475, 481 [59 Pac. (2d) 858]; *Hartford* v. *Industrial Acc. Com.*, 2ᴜ2 Cal. 688, 693 [262 Pac. 309, 58 A. L. R. 1392]; *Archbishop* v. *Industrial Acc. Com.*, 194 Cal. 660 [230 Pac. 1]; *Western P. R. R.* v. *Industrial Acc. Com.*, 193 Cal. 413 [224 Pac. 754].) The question of whether a worker is an employee within the meaning of the Compensation Act (Act 4749, Deering's Gen. Laws, vol. 2, p. 2272 et seq.), is referred to as a question of mixed law and fact to be proved like any other question. (*Hillen*

v. *Industrial Acc. Com.*, 199 Cal. 577 [250 Pac. 570]; *La Franchi* v. *Industrial Acc. Com.*, 213 Cal. 675 [3 Pac. (2d) 305].) It is a question of fact upon which the judgment of the commission is conclusive where the facts are in dispute. It becomes a question of law only when but one inference can reasonably be drawn from the facts. Where two opposing inferences may be drawn from the evidence, and the inference accepted by the commission is reasonable, and is supported by evidence in the record, that inference must be sustained. (*Schramm* v. *Industrial Acc. Com.*, *supra; West-ern P. R. R.* v. *Industrial Acc. Com.*, *supra; Archbishop* v. *Industrial Acc. Com.*, *supra.*) ■ Moreover, in cases of this character the burden of proof rests upon an alleged employer to establish "that an injured person claiming to be an employee is an independent contractor or otherwise excluded from the protection of (the) act, where there is proof that such injured person was at the time of his injury actually performing service for the alleged employer". (Compensation Act, *supra*, sec. 19d [1]; *Hillen* v. *Industrial Acc. Com.*, *supra; Murray* v. *Industrial Acc. Com.*, 216 Cal. 340 [14 Pac. (2d) 301]; *York Junc. etc. Co.* v. *Industrial Acc. Com.*, 202 Cal. 517 [261 Pac. 704]; *Metropolitan etc. Co.* v. *Industrial Acc. Com.*, 117 Cal. App. 369 [4 Pac. (2d) 190].)

■ In this case the finding of the commission that Sue Alric Marrion was an employee of petitioner, and not an independent contractor, must be sustained. Although petitioner repeatedly testified that he hired Sue Alric Marrion as an independent contractor, this was merely a statement of petitioner's own conclusion from the facts. Ostensibly certain features of the employment indicated a relationship of independent contractor, but these factors only served to create a conflict of evidence and opposing inferences to be drawn therefrom, which conflict the commission chose to resolve adversely to petitioner. If this court had been sitting as the trier of the facts, it is possible that an opposite conclusion might have been reached. On review, however, it cannot be said that the evidence established the relation of independent contractor as a matter of law. The conflicting evidence was clearly susceptible of two opposing inferences. The inference accepted by the commission was reasonable and amply supported, and therefore the commission's finding will not be disturbed.

■ We may add that the evidence in this record has been reviewed in the light of various tests used in determining whether a relationship is one of employee or of independent contractor, such as the test of "complete and unqualified control", of "payment of wages", or of "right of discharge". While these tests are recognized as helpful, yet no special test, or fact, or circumstance has been found to give a conclusive answer to the question, and in the last analysis each case must turn upon its own peculiar facts and circumstances. (*Washko* v. *Stewart*, 20 Cal. App. (2d) 347, 351 [67 Pac. (2d) 144] ; *Hillen* v. *Industrial Acc. Com., supra; Murray* v. *Industrial Acc. Com., supra; George* v. *Chaplin*, 99 Cal. App. 709 [279 Pac. 485] ; *May* v. *Farrell*, 94 Cal. App. 703, 710 [271 Pac. 789] ; *Metropolitan etc. Co.* v. *Industrial Acc. Com., supra; Batt* v. *San Diego Sun*, 21 Cal. App. (2d) 429 [69 Pac. (2d) 216] ; *Bohanon* v. *James McClatchy Pub. Co.*, 16 Cal. App. (2d) 188 [60 Pac. (2d) 510] ; *Winther* v. *Industrial Acc. Com.*, 16 Cal. App. (2d) 131 [60 Pac. (2d) 342] ; *Curcic* v. *Nelson Display Co.*, 19 Cal. App. (2d) 46 [64 Pac. (2d) 1153] ; 75 A. L. R., note, p. 725 et seq.) Petitioner relies strongly upon the case of *Brosius* v. *Orpheum Theater Co.*, 16 Cal. App. (2d) 61 [60 Pac. (2d) 156]. That case could properly be cited in support of a contention that decedent's relation to the Conklin Shows was that of an independent contractor, and not of an employee, but the holding is inapplicable to the situation here under review.

■ The commission found that there was left surviving decedent, John Barr, her five-year-old son, a total dependent, and it awarded $4,446 for his benefit. Petitioner questions this finding of total dependency. Petitioner refers to evidence that since birth the boy had been cared for by his grandfather, who represents him herein as guardian *ad litem* and trustee, and petitioner complains that no proof was offered to show that the boy's father, who was legally liable for his support, was unable to provide adequately for him. The commission contends that the minor was entitled to the presumption of total dependency under section 14a (2) of the act, or that in any event the facts showed a total dependency under section 14 (b).

We are of the view that there is to be found, in the conflicting evidence in the record, sufficient support for the commission's finding of total dependency. In support of the finding there was evidence that decedent had been divorced

from the child's father; that the father had never contributed to the child's support; that in fact his whereabouts were unknown, and efforts to locate him had proved fruitless. There was further evidence that although decedent and the child had been on relief, and that when decedent was out of work they stayed with her parents, yet when decedent did have work she contributed to the child's support, and the child was dependent upon her.

The award is affirmed.

Shenk, J., Waste, C. J., Curtis, J., and Langdon, J., concurred.