.[Civ. No. 26372.    Second Dist., Div. One.    Aug. 13, 1962.]

DONALD A. DURAE, Petitioner, v. INDUSTRIAL ACCI-
DENT COMMISSION, WILLIAM B. MANSKER et al.,
Respondents.

Hecker, Dunford & Kenealy and George L. Hecker for Petitioner.

Everett A. Corten and Edward A. Sarkisian for Respondents.

THE COURT.—This is a proceeding to review and annul an award of workmen's compensation benefits to William B. Mansker based on a finding that Mansker was injured while acting as an employee of the petitioner and not as an independent contractor.

Petitioner is a motion picture and television actor. He was engaged to make a personal appearance at a rodeo in Pueblo, Colorado, in August 1960. His act was to include a demonstration to the audience of how motion picture and television shows were filmed. As a part of this demonstration, a man would ride a horse at a fast pace across the area, petitioner would fire a shot at the rider, and the rider would fall from the horse, taking what, among stuntmen, is commonly called a "saddle fall" to the ground. In previous engagements a stuntman named Tom Sweet had been the rider and taken these saddle falls, using a device called a "pelican hook" which releases the saddle from the horse as the rider falls. Sweet and petitioner had a written contract for those engagements. Sweet was not available for the Pueblo appearance and referred petitioner to Mansker.

Mansker, the applicant here, was a qualified stunt rider who worked for various motion picture and television studios and was a member of the Screen Actors Guild. Petitioner contacted Mansker and it was orally agreed that Mansker would take Sweet's place in the act for three days in Pueblo and on the following weekend in Kansas. He appeared in the act at the afternoon and evening performances of the first day, taking a fall at each performance. In making the fall on the afternoon of the second day, he suffered injury to his left shoulder as a result of which the claim for compensation was filed.

There were two hearings of the matter before the referee. The first was on March 20, 1961, at the conclusion of which it adjourned to further hearing. The second was on September 8, 1961, following which the referee made his findings and order dismissing the action. The referee determined that the applicant was an independent contractor, stating that "[h]e undertook to accomplish a specific task for a specified price, was free from control as to the details of performance, and was responsible solely for the result. I believe he is comparable

to a vaudeville entertainer. *Brosius* v. *Orpheum Theatre Co., Ltd.,* 16 Cal.App.2d 61 [60 P.2d 156].''

Upon application for reconsideration, it was the recommendation of the referee that the petition be denied. However, the respondent commission granted the petition with the resultant award in favor of applicant based upon the finding that he was an employee. The sole question upon this review is as to the status of applicant in performing the said service—was he an independent contractor, or was he the employee of petitioner?

Certain details of the oral agreement between the parties were undisputed. Mansker was to make two saddle falls each day of the three-day engagement in Pueblo. A horse and saddle, air transportation and hotel accommodations were to be provided for him. He would provide his own clothing and padding. Other terms of their agreement are the subject of conflicting evidence.

In respect to the making of the agreement petitioner testified: ''I discussed with him the price. I told him that I had been accustomed to paying $100.00 a day. In this case it was for three days which would be $300.00 or $50.00 a fall, anyway you like to look at it, because I would prorate it.'' He further testified that he discussed with Mansker the agreement he had previously made with Sweet and told him that agreement provided that the stunt man was to be an independent contractor and that petitioner was not to be liable or responsible for any of his actions; he did not show Sweet's contract to Mansker; the latter told him he had discussed the agreement with Sweet and would be glad to work under the same terms and arrangements; he told Mansker that he didn't take any deductions or withholdings from the pay and Mansker replied that ''he didn't expect it under this type of deal''; petitioner asked Mansker whether ''he knew all stuntmen are required to carry insurance'' and Mansker said that he had a small policy.

Mansker testified as follows: petitioner told him he would receive a flat rate of $100 a day, not $50 a fall; nothing was said about social security, old age or withholding taxes; the only conversation he had with petitioner regarding insurance was after his injury; his talk with Sweet concerned only the price he was to be paid; he did not remember Sweet's saying he usually got a written contract and he at no time saw a written contract. When petitioner referred to his contract

with Sweet, he mentioned only the compensation to be paid; the term "independent contractor" was not used by either of them in this conversation.

The morning after their arrival in Pueblo, preceding the first performance, Mansker and petitioner went out to the arena and "looked over the situation." Mansker testified that the horse and saddle were provided by the rodeo management through arrangements made by petitioner and that he, Mansker, had no choice as to the horse he was to ride. He testified that at this time petitioner explained how he presented his act,—he would stand in the middle of the arena, talk about "Johnny Ringo" the character he portrays in a television show, would sing some songs, and tell about the filming of television pictures; Mansker was to be sitting on the horse at the north end of the arena awaiting the particular point in the act where petitioner starts to talk about his gun; then upon a signal from petitioner, Mansker was to ride "at a run" across the arena; "there was a place picked where I should be shot off this horse pretty close to the middle of the arena. . . . Wherever he shot his pistol, that's where I took my fall." Mansker said that these decisions were made by petitioner "with one stipulation: I could change directions if I got sore." He further stated: "As far as the mechanics are concerned, there was nothing said about how to make the fall. There was one piece of equipment furnished, called in the business a pelican hook or quick release, that he specified that he wanted me to use, that when you take this fall, the saddle goes with you." Petitioner said he would like it because it made a spectacular fall. Nothing was said about him taking other jobs at the rodeo; he took no other jobs.

Petitioner testified in respect to these matters that he did not provide the horse; that Mansker could have picked any horse he wanted; he told Mansker he would not "control" him when he fell; that it was mutually agreed when the fall would come; with regard to the use of the pelican hook, "I told him it didn't matter to me. . . . I told him I would be glad to get it from Tom Sweet and take it along; if he liked, he could use it; if he didn't like it, he could use the normal saddle fall that everyone knows." He said there were no restrictions as to Mansker's activities, just that he was to make two falls each day.

Transcripts of the two hearings before the referee appear in the record before us. The transcript of the second hearing was not in the record before the commission; it was not

prepared until after reconsideration by the commission. However, in the record before the commission was the referee's report of that hearing which summarized the oral evidence, including testimony of both petitioner and Mansker concerning Mansker's status.

The first contention of the petitioner is that, under Labor Code, section 5315,[1] the commission must read the full and complete record, including a transcript of the oral proceedings of September 8, 1961, before it can reverse the referee's finding. This contention has recently been answered in *Allied Comp. Ins. Co.* v. *Industrial Acc. Com.,* 57 Cal.2d 115 [17 Cal.Rptr. 817, 367 P.2d 409], wherein it is stated at pages 119-120: "It is clear that the commission is required to make an independent examination of the record when, as here, it rejects the findings and recommendations of its referee. [Citations.] The extent of that independent examination has not, however, been clearly defined. In the first *Morgan* case the United States Supreme Court held generally that 'The one who decides must hear.' (*Morgan* v. *United States,* 298 U.S. 468, 481 [56 S.Ct. 906, 80 L.Ed. 1288].)

The requirement of a hearing may be satisfied, however, even though the members of the commission do not actually hear [citations], or even read, *all* of the evidence. [Citations.] 'Evidence may be taken by an examiner. Evidence thus taken may be sifted and analyzed by competent subordinates.' (*Morgan* v. *United States, supra,* 298 U.S. 468, 482; *Lumbermen's Mut. Cas. Co.* v. *Industrial Acc. Com., supra,* [29 Cal.2d 492 (175 P.2d 823)] p. 501.) The obligation of the panel members was to achieve a substantial understanding of the record by any reasonable means, including the use of the referee's summary. (See 2 Davis, Administrative Law Treatise, §§ 11.02-11.04, pp. 38-57.)" (See also *Industrial Indem. Co.* v. *Industrial Acc. Com.,* 57 Cal.2d 123 [17 Cal.Rptr. 821, 367 P.2d 413].)

Petitioner contends that the facts herein are distinguishable from those in the Allied and Industrial Indemnity Company cases and require annulment of the award. It is urged that in this case the commission, in its order granting reconsidera-

---

[1] § 5315. "Within sixty (60) days after the filing of the findings, decision, order or award, and the accompanying report, the commission may confirm, adopt, modify or set aside the findings, order, decision, or award of a commissioner or referee and may, with or without further proceedings, and with or without notice, enter its order, findings, decision, or award based upon the record in the case."

tion, expressed its desire "to review a complete transcript of the proceedings and to make a further study of the record" and thought it had the full transcript before it. In view of the fact that the referee's summary of the September 8 testimony was in the record, it is illogical to conclude that the commission "thought it had the complete transcript before it." ██ No question is raised as to the completeness or accuracy of that report and we find no objectionable defects or omissions therein. It is to be presumed that the commission considered the report and we find it adequate to provide the commission with a complete and full understanding of the record.

Petitioner next asserts that under the evidence there is only one conclusion to be reached, "i.e., that applicant was an independent contractor." In other words, that there is no evidence to support the determination of the commission that applicant was an employee. ██ In *Gonzales* v. *Industrial Acc. Com.*, 50 Cal.2d 360, 364 [325 P.2d 993], the court states the rule to which this court is limited in review as follows: "Findings of the Industrial Accident Commission are not subject to review on the ground that there is no substantial evidence to sustain them, except insofar as it may appear that they have been made without *any* evidence whatever in their support. (*Douglas Aircraft, Inc.* v. *Industrial Acc. Com.*, 47 Cal.2d 903, 905 [2] [306 P.2d 425].)"

██ "The question of whether a worker is an employee within the meaning of the Compensation Act (Act 4749, Deering's Gen. Laws, vol. 2, p. 2272 et seq.), is referred to as a question of mixed law and fact to be proved like any other question. [Citations.] It is a question of fact upon which the judgment of the commission is conclusive where the facts are in dispute. It becomes a question of law only when but one inference can reasonably be drawn from the facts. ██ Where two opposing inferences may be drawn from the evidence, and the inference accepted by the commission is reasonable, and is supported by evidence in the record, that inference must be sustained. [Citations.] ██ Moreover, in cases of this character the burden of proof rests upon an alleged employer to establish 'that an injured person claiming to be an employee is an independent contractor or otherwise excluded from the protection of (the) act, where there is proof that such injured person was at the time of his injury actually performing service for the alleged employer.' [Cita-

tions.]'' (*Schaller* v. *Industrial Acc. Com.*, 11 Cal.2d 46, 50-51 [77 P.2d 836].)

Petitioner takes the position that applicant was engaged in an independent calling requiring a unique combination of skill and dexterity and that petitioner had no control as to the mode of doing the work contracted for; thus applicant was not an employee within the meaning of section 3000 of the Labor Code.[2] Rather, it is contended that applicant, as a matter of law, was an independent contractor since he was engaged to accomplish a specific result for a specified compensation (Lab. Code, § 3353).[3]

█ In *Isenberg* v. *California Emp. Stab. Com.*, 30 Cal.2d 34, 39 [180 P.2d 11], the court restates the rules set forth in *Empire Star Mines Co.* v. *California Employment Com.*, 28 Cal.2d 33, 43 [168 P.2d 686], for the determination of the question whether or not a person is an independent contractor or an employee, as follows: ''The principal test of the employment relationship was held to be the 'right to control over the manner and means of accomplishing the result desired.' █ Strong evidence of this right is shown by the right of the principal to discharge the worker. █ The secondary tests are listed in that opinion as including, '(a) whether or not the one performing service is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or workman supplies the instrumentalities, tools, and the place of work for the persons doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by time or by the job; (g) whether or not the work is a part of the regular business of the principal; (h) whether or not the parties believe they are creating the relationship of employer-employee. (Rest., Agency, § 220; Cal.Ann., § 220.)''' Each case necessarily must turn upon its own

[2] § 3000. ''A servant is one who is employed to render personal service to his employer, other than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the employer, who is called his master.'' (Cf. Lab. Code, §§ 3350 and 3351.)

[3] § 3353. '' 'Independent contractor' means any person who renders service for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished.''

peculiar facts and circumstances. (*Schaller* v. *Industrial Acc. Com.*, *supra*, 11 Cal.2d 46, 52.)

Applying the foregoing rules and tests to the present situation, we are of the opinion that the commission could reasonably find that the service of applicant was performed as an employee. There is no doubt but that certain features of the informal working arrangement are indicative of an independent contractor relationship, but these factors merely created a conflict in opposing inferences to be drawn from the evidence. ▮ It is not our function to determine the credibility of the witnesses or the weight to be attached to their testimony; the commission is the final arbiter on questions of fact.

▮ It is undisputed that the instrumentalities for the performance of applicant's saddle fall were supplied by or through petitioner. In resolving the conflicts in the evidence, the commission could conclude that petitioner required the fall to be executed with the pelican hook, and that he had general supervision and immediate control of all details of applicant's performance to the extent that it is possible to control any skilled workman. ▮ As stated in *Isenberg* v. *California Emp. Stab. Com.*, *supra*, 30 Cal.2d 34, 39, "many skilled workmen are employees." The fact that a certain amount of freedom is inherent in the nature of the work does not require that one be characterized as an independent contractor. (*George* v. *Chaplin*, 99 Cal.App. 709, 712 [279 P. 485].)

▮ It can be inferred from the commission's findings that petitioner's instructions amounted to more than mere suggestion as to detail; that applicant was not employed to perform a totally independent act but, rather, was employed as an assistant, to perform as a part of an act prepared and arranged by petitioner. The situation is thus distinguishable from that in *Brosius* v. *Orpheum Theatre Co., Ltd.*, *supra*, 16 Cal.App.2d 61. ▮ Even where a high degree of skill is required, if the occupation is one which ordinarily is considered an incident of the business of the employer, there is an inference that the skilled person is an employee. (Rest., Agency, 2d, § 220, comment i.) Applicant was not left, like a plumber, an auto mechanic, or an electrician, "to produce the desired result in his own way." (See *Bennett* v. *Truebody*, 66 Cal. 509, 512 [6 P. 329, 56 Am.Rep. 117]; cf. *Ponsetti* v. *Industrial Acc. Com.*, 5 Cal.App.2d 498, 500 [42 P.2d 1043]; *Perguica* v. *Industrial Acc. Com.*, 29 Cal.2d 857, 862 [179 P.2d 812].) ▮ "Nor is it inconsistent with the theory that the applicant was not an independent contractor

that she might perform other work than that for the principal." (*Hartford A. & I. Co.* v. *Industrial Acc. Com.*, 93 Cal.App. 313, 316 [269 P. 733].)

It cannot be said as a matter of law that the evidence established unequivocally the relation of independent contractor. The evidence is susceptible of opposing inferences and that accepted by the commission was not unreasonable. It finds support in the evidence.

This finding is compatible with the findings affirmed by the Supreme Court in two cases somewhat comparable on their facts. In *Drillon* v. *Industrial Acc. Com.*, 17 Cal.2d 346 [110 P.2d 64], one who hired a jockey to ride his horse in one race was held to be an employer on the basis that he had the right to control the manner in which the jockey rode the horse. In *Schaller* v. *Industrial Acc. Com.*, *supra*, 11 Cal.2d 46, the petitioner made separate contracts with four trapeze aerialists that each would perform his specialty for a 20-week engagement. He then agreed to provide the four aerialists as an act in a traveling show. He was held to be an employer although he in no manner directed the act or the stunts of the individual aerialists.

Petitioner raises a further point. He contends that the applicant was estopped to deny that he was an independent contractor as to petitioner because by his declarations and acts he led petitioner to believe that he was an independent contractor. It is argued that applicant agreed to accept "the same deal" as his predecessor, Tom Sweet, and that the arrangement with Sweet was that he was to be an independent contractor. The commission, in its opinion, fairly stated the evidence in this respect: "Applicant did state that the other stuntman [Sweet] had told him what his deal was with defendant and that he (applicant) as far as he knew got the same deal. There is no showing that applicant had either read the contract or orally agreed to accept the specific terms of the contract. Thus, the contract is immaterial." Obviously, essential elements of estoppel are lacking. (See 18 Cal.Jur.2d, § 5, p. 406; § 9, p. 409.) Furthermore, petitioner's testimony to the effect that he contracted with both applicant and Sweet as independent contractors was merely a statement of his own conclusion. (*Schaller* v. *Industrial Acc. Com.*, *supra*, 11 Cal.2d 46, 51.) It is stated in *Isenberg* v. *California Emp. Stab. Com.*, *supra*, 30 Cal.2d 34, 40: "The belief of the parties as to the relationship created is relevant only to indicate whether or not there was an assumption of

control by the principal and submission thereto by the worker. (Rest., Agency, § 220, comment (i).)'' Since applicant had never seen the contract and did not know the details thereof, the commission did not, as petitioner contends, exceed its jurisdiction ''in ruling the contract immaterial'' and in refusing to admit it into evidence.

The award is affirmed.